THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GRAHAM-BINGHAM  IRREVOCABLE TRUST, a Washington trust; and HENRY DEAN, Trustee of the Graham-Bingham Irrevocable Trust,<br><br>                   Plaintiffs,<br><br>          v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY USA,<br><br>                   Defendant. | No.  C10-1185Z<br><br>ORDER |

THIS MATTER comes before the Court on a motion for summary judgment brought by defendant John Hancock Insurance Company USA ("John Hancock"), docket no. 37, and a cross-motion for partial summary judgment brought by plaintiffs Graham-Bingham Irrevocable Trust (the "Trust") and trustee Henry Dean, docket no. 43.  Having reviewed all papers filed in support of, and in opposition to, the parties' motions, and having considered the oral arguments of counsel, the Court

entered a Minute Order, docket no. 78, granting in part and denying in part each motion. This Order explains the Court's reasons for its rulings on the parties' motions.

The central issue in this case is whether a variable life insurance policy issued by John Hancock in July 2006 (the "Policy") remains in effect despite failure by the owner of the Policy, namely the Trust, to timely pay a premium. A premium in the amount of roughly $544,000 was due on February 20, 2010. The Trust arranged for a third party, Donald Trudeau, to pay the premium. The check that Mr. Trudeau presented, however, was dishonored because of non-sufficient funds ("NSF"), and John Hancock declared the Policy lapsed. Plaintiffs then brought this action, asserting several claims aimed at either securing a refund of the premiums previously paid or reviving the Policy, which had a face value of $23 million.

Plaintiffs allege that John Hancock violated certain provisions of Washington's Insurance Law, RCW Title 48, and that these violations are actionable under that statute. Plaintiffs also contend that these violations constitute a breach of contract, a violation of Washington's Consumer Protection Act ("CPA"), and a breach of the duty of good faith owed by an insurer. Plaintiffs further assert that John Hancock violated the Washington State Securities Act ("WSSA") and engaged in fraud. As explained in this Order, many of plaintiffs' claims are not cognizable or lack merit as a matter of law. As to plaintiffs' CPA and bad faith claims, however, the Court concludes that plaintiffs have presented triable issues.

/ / /

**Background**

**A.      Chronology of Events**

The Policy in question was issued on July 10, 2006.  It insures the life of

Frances P. Graham, who is now 88 years old.  Carli Decl. at ¶¶ 8-9 & Exs. 2 & 3

(docket nos. 39, 39-2, & 39-3).  On December 21, 2009, John Hancock sent the Trust a

Lapse Warning Notice, advising that the Policy would lapse if a premium in the

amount of $544,147.24 was not received by February 20, 2010.  *Id.* at ¶ 14; Ex. 13 to

Merkl Decl. (docket no. 38-12).  On January 21, 2010, John Hancock sent a Lapse

Warning Reminder Notice containing the same information.  Carli Decl. at ¶ 15

(docket no. 39); Ex. 14 to Merkl Decl. (docket no. 38-12).

In May 2009, the Trust had commenced efforts to sell the Policy.  Response to

Interrogatory No. 14, Ex. 12 to Merkl Decl. (docket no. 38-11).  Donald Trudeau

expressed interest in the Policy.  Dean Dep. at 79:3-10, Ex. 1 to Merkl Decl. (docket

no. 38-1).  Given this interest, the Trust arranged to have Mr. Trudeau pay the

premium due in February 2010.  *See* Ex. 26 to Merkl Decl. (docket no. 38-14);

Trudeau Dep. at 76:22-25, 155:11-14, Ex. 7 to Merkl Decl. (docket no. 38-8);

Johnston Decl. Ex. 55-D (docket no. 49-3).

On February 20, 2010, Mr. Trudeau deposited a check for $554,000 at a

Citibank branch in Connecticut, to be credited to a John Hancock account typically

/ / /

/ / /

used for wire transfers.[1]  Ex. 1-D to Johnston Decl. (docket no. 50); Trudeau Dep. at 70:11-71:3, Ex. 7 to Merkl Decl. (docket no. 38-8); King Dep. at 101:7-102:5, Ex. 9 to Merkl Decl. (docket no. 38-10).  The check contained the words "Frances Graham Policy" and the Policy number.  Ex. 1-D to Johnston Decl. (docket no. 50).  On February 22, 2010, Mr. Trudeau gave a copy of the deposit receipt to the Trust's broker, who transmitted it to John Hancock.  Samuelson Decl. at ¶¶ 3-5 & Exs. 1 & 2 (docket no. 40); Kosmos Dep. at 39:3-4, 156:10-12, Ex. 4 to Merkl Decl. (docket no. 38-5); Klein Dep. at 111:13-25, 113:4-9, Ex. 28 to Merkl Decl. (docket no. 38-14).

On February 20, 2010, John Hancock's computer system automatically generated and sent to the Trust a Lapse Termination Notice, advising that the "Policy terminated due to insufficient funds available to cover policy charges."  Carli Decl. at ¶ 16 (docket no. 39); Ex. 16 to Merkl Decl. (docket no. 38-12).  When John Hancock's Reinstatement Team subsequently received the copy of the deposit receipt provided by Mr. Trudeau and submitted by the Trust's broker, it agreed to treat the February 20, 2010, lapse as a lapse in error ("LIE") and to administer the Policy as though it had never lapsed.  Frazee Decl. at ¶¶ 3-5 & Ex. 1 (docket no. 42); Exs. 9 & 17 to Carli Decl. (docket nos. 39-9 & 39-11); Carli Dep. at 98:8-23, Ex. 8 to Merkl Decl. (docket no. 38-9); Dean Tr. 121:1-10, 122:13-15, Ex. 1 to Merkl Decl. (docket no. 38-1).

---

[1] The account upon which Mr. Trudeau drew the check contained less than $150 at the time the check was presented to Citibank.  Ex. 18 to Merkl Decl. (docket no. 38-12).  Mr. Trudeau knew that the account did not have sufficient funds to cover the check, but he did not notify the Trust of this fact either at the time he presented the check or when his bank advised him three days later that the check had been dishonored.  Trudeau Dep. at 196:25-197:4, 221:15-222:6, Ex. 7 to Merkl Decl. (docket no. 38-8); Ex. 17 to Merkl Decl. (docket no. 38-12).

On March 4, 2010, John Hancock sent the Trust a Confirmation of Transaction, and the next day, it sent the Trust a letter.  Both the Confirmation and the letter indicated that $554,000 had been paid on February 20, 2010.  Ex. 6 to Carli Decl. (docket no. 39-8); Ex. X to Johnston Decl. (docket no. 51 at 2).  On April 16, 2011, the Trust submitted another premium payment in the amount of $60,000.  Ex. X to Johnston Decl. (docket no. 51 at 29 & 30).  On April 21, 2010, John Hancock generated a related Confirmation of Transaction.  Carli Decl. at ¶ 19 & Ex. 7 (docket nos. 39 & 39-8).  Also on April 21, 2010, John Hancock sent the Trust a Quarterly Activity Statement, indicating that the Policy's cash surrender value was $94,781.43 and that a payment of $554,000 had been made.  Carli Decl. at ¶ 20 & Ex. 8 (docket nos. 39 & 39-8).

According to plaintiffs, sometime prior to these communications from John Hancock, the Trust was negotiating, through its broker, to sell the Policy to a third party.  Plaintiffs allege that a potential buyer requested a Verification of Coverage ("VOC").  Dean Decl. at ¶ 2 (docket no. 44-2).  On April 22, 2010, in response to the Trust's broker's request, John Hancock furnished the Trust with a VOC, which represented that the Policy was in effect.  _Id._; King Decl. at ¶ 7 & Ex. 1 (docket no. 41).  The VOC additionally stated that no premium payment was due until July 21, 2010.  Ex. 1 to King Decl. (docket no. 41).  Plaintiffs claim that, after the VOC was issued, a third party made a written offer to purchase the Policy for $3.1 million, but

because John Hancock declared the Policy lapsed, "the deal fell apart." Dean Decl. at ¶ 3 (docket no. 44-2); *see* Ex. D-70 to Johnston Decl. (docket no. 58-1).

John Hancock declared the Policy lapsed on April 26, 2010. The events leading up to this decision are as follows. On or about March 5, 2010, John Hancock's Treasury Department received notice that Mr. Trudeau's check had been dishonored as NSF. Carli Decl. at ¶ 26 & Ex. 10 (docket nos. 39 & 39-9 at 14). The Treasury Department did not receive the dishonored check until March 24, and the Billing & Income Team did not link the dishonored check to the Policy until April 22, 2010. Carli Decl. at ¶¶ 21, 23-27 & Exs. 11 & 12 (docket nos. 39, 39-9, & 39-10); Carli Dep. at 134:5-12, Ex. 8 to Merkl Decl. (docket no. 38-9). On April 26, 2010, John Hancock sent a letter (dated April 22, 2010) to former trustee David Bingham, indicating that the check "protested due to Non-Sufficient Funds" and that the premium payment had been reversed. Carli Decl. at ¶ 28 & Ex. 13 (docket nos. 39 & 39-10). The letter further stated that "[f]ailure to provide a replacement check by the premium due date may result in policy lapse and termination of your contract," but it did not specify a premium due date. Ex. 13 to Carli Decl. (docket no. 39-10). On July 27, 2010, John Hancock sent a letter indicating that the Policy "ha[d] lapsed effective February 20, 2010," and enclosing a refund of the $60,000 premium paid in April 2010. Ex. 22 to Merkl Decl. (docket no. 38-13). The Trust declined to accept the refund. Carli Decl. at ¶ 20 (docket no. 39).

**B.**   **Form of Lapse Notices**

In July 2009, three years after the Policy was issued, but before John Hancock sent the lapse notices in question, a new Washington statute relating to such notices went into effect.  The new legislation requires an insurer to send, along with any lapse notice relating to a policy insuring the life of an individual 60 years of age or older, a notice of alternative transactions.  RCW 48.102.100(1)(c).  On July 28, 2009, an emergency regulation went into effect specifying the language to be used in notices of alternative transactions.  WAC 284-97-910 (2009), Ex. 19 to Carli Decl. (docket no. 39-12 at 21).  Although John Hancock knew about the regulation, it did not send a notice of alternative transactions to the Trust when it mailed the Lapse Warning Notice in December 2009 or when it mailed the Lapse Warning Reminder Notice in January 2010.  Carli Dep. 110:7-24, Ex. 8 to Merkl Decl. (docket no. 38-9); Hough Decl. at ¶ 15 (docket no. 55).

The parties dispute whether John Hancock's failure to send a notice of alternative transactions was justified or a willful violation of the statute.  John Hancock contends that the text of the emergency regulations was confusing.  Hough Decl. at ¶¶ 7, 14-15 (docket no. 55).  It asserts that, because it knew the regulation would soon be revised, it reasonably decided to wait for the issuance of the amended text before sending out any notices of alternative transactions.  *Id.*; *see also* Ex. 7 to Hough Decl. (docket no. 55 at 49).  Plaintiffs counter that, in making this decision, John Hancock understood that it was "accepting the risk in not being fully compliant"

and knew that it "could be dinged for non-compliance." Ex. 4 to Hough Decl. (docket

no. 55). A revised regulation, which is virtually identical to the emergency regulation,

was issued on March 2, 2010, and John Hancock began using the approved text in

lapse notices in April 2010. Hough Decl. at ¶ 17 (docket no. 55); _compare_ WAC 284-

97-910 (2010) _with_ WAC 284-97-910 (2009).

## Discussion

### A.   Summary Judgment Standard

The Court shall grant summary judgment if no genuine issue of material fact

exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a) (2010). In support of a motion for summary judgment, the moving party need

not negate the opponent's claim, _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986);

rather, the moving party will be entitled to judgment if the evidence is not sufficient

for a jury to return a verdict in favor of the opponent, _Anderson v. Liberty Lobby, Inc._,

477 U.S. 242, 249 (1986). When the record taken as a whole, could not lead a rational

trier of fact to find for the non-moving party, summary judgment is warranted. _See_

_Beard v. Banks_, 548 U.S. 521, 529 (2006).

### B.   Violation of Insurance Law

Plaintiffs assert that John Hancock violated RCW 48.23.030, 48.18.290(1)(c),

and 48.102.100(1)(c) and is therefore liable for "Breach of Insurance Law." Second

Am. Compl. ¶ 30 (docket no. 12). RCW Title 48, however, does not create a private

cause of action. _Pain Diagnostics & Rehab. Assocs., P.S. v. Brockman_, 97 Wn. App.

691, 697, 988 P.2d 972 (1999) ("In creating the insurance regulatory scheme, the Legislature and the insurance commissioner did not intend to provide protection or remedies for individual interests; they only intended to create a mechanism for regulating the insurance industry.  Instead, private causes of action for violations of the insurance statutes and regulations must be brought under the CPA."); *see* *Jepson v. Ticor Title Ins. Co.*, 2007 WL 2060856 at *2 (W.D. Wash. May 1, 2007) ("[p]laintiff's attempt to manufacture an implied private right of action under § 48.29.140 has no merit in light of [*Pain Diagnostics*]").

Moreover, two of the three statutes on which plaintiffs rely, RCW 48.23.030 and RCW 48.18.290(1)(c), do not apply to the Policy.  RCW 48.23.030 does not apply to variable life insurance policies.  *See* RCW 48.18A.050.  RCW 48.18.290 does not apply to "contracts of life or disability insurance without provision for cancellation prior to the date to which premiums have been paid."  RCW 48.18.290(5).  Plaintiffs identify no provision in the Policy for cancellation that would render RCW 48.18.290 applicable.  *See* Ex. 3 to Carli Decl. (docket no. 39-3) (Section 11 of the Policy allows termination for only non-payment of a premium, surrender of the Policy by the insured, or death of the insured).  Thus, plaintiffs have no cognizable stand-alone claim for violation of RCW 48.23.030, RCW 48.18.290, or Washington's Insurance Law generally.

/ / /

/ / /

**C.**   **Breach of Contract**

In alleging that John Hancock breached the Policy, plaintiffs assert two different theories.  First, they contend that John Hancock accepted Mr. Trudeau's check as payment of the premium due in February 2010, and that John Hancock's declaration of lapse therefore constitutes a breach of contract.  Second, plaintiffs argue that the new statute requiring notice of alternative transactions became a term of the Policy and that John Hancock breached the Policy by failing to provide such notice. Plaintiffs' analysis is flawed.

**1.**   **Check Was Not "Accepted"**

Plaintiffs assert that John Hancock manifested an intent to accept the NSF check as unconditional payment of the premium at issue.  Plaintiffs misunderstand the relevant legal doctrines.  Under Washington law, payment by check or other instrument is conditional unless the parties agree otherwise.  _Barlean v. Rogers_, 596 P.2d 1327, 1328 (Or. Ct. App. 1979) (applying Washington law).  In other words, the giving of a check or other instrument for a pre-existing debt does not discharge the preexisting debt and create a new debt independent thereof in the absence of an agreement between the parties to that effect.  _Blenz v. Fogle_, 127 Wn. 224, 232, 220 P. 790 (1923); _see also_ _Pardee v. Jolly_, 163 Wn.2d 558, 570, 182 P.3d 967 (2008) ("The issuance of an uncertified check suspends the underlying obligation until the check is paid or certified.  If a check is dishonored and the person entitled to enforce the check is the obligee of the obligation for which the check was taken, the obligee may enforce

either the instrument or the obligation."); _Rains v. Lewis_, 20 Wn. App. 117, 123, 579

P.2d 980 (1978); _see also_ RCW 62A.3-310.  The party asserting an agreement to

discharge the preexisting obligation bears the burden of proving its existence.  _Blenz_,

127 Wn. at 232.

In this case, plaintiffs present no evidence of such agreement.  Instead, they

suggest that an agreement may be inferred from "the circumstances and the conduct of

the parties," citing _New York Life Ins. Co. v. Miller_, 135 F.2d 550, 551 (9th Cir. 1943).

Neither the circumstances nor the conduct of the parties warrant such inference.

Mr. Trudeau did not present the check directly to John Hancock.  The check was

presented to Citibank, which routed it to the bank on which it was drawn, namely

Wachovia, at which point the check was not "accepted" within the meaning of

RCW 62A.3-409(a), but rather was dishonored.  Ex. 1-D to Johnston Decl. (docket

no. 50); Ex. 17 to Merkl Decl. (docket no. 38-12).  Before learning of this dishonor,

John Hancock decided to treat the Policy as if it were in effect after February 20, 2010.

This conduct was not based on the check itself, but rather on the deposit receipt

submitted by the Trust's broker.  Samuelson Decl. at ¶ 3 (docket no. 40).  Thus,

plaintiffs have provided no basis for imputing to John Hancock either an intent or an

agreement to treat Mr. Trudeau's check as discharging the underlying obligation to

pay the premium due in February 2010.

/ / /

/ / /

### 2.   Policy Lapsed Despite Failure to Give Notice of Alternative Transactions

Plaintiffs attempt to avoid the clear rule that non-payment of a life insurance premium results in the forfeiture of the policy, _Klein v. N.Y. Life Ins. Co._, 104 U.S. 88, 90 (1881), by asserting that John Hancock's violation of RCW 48.102.100(1)(c) vitiated any lapse of the Policy.  Although the Court agrees that, as a matter of law, John Hancock violated RCW 48.102.100(1)(c) by not sending the requisite notices in December 2009 and January 2010,[2] the Court rejects plaintiffs' argument that such violations prevented the Policy from lapsing.  Nothing in RCW Chapter 48.102 makes compliance with statutory notice requirements a condition precedent to the lapsing of a life insurance policy.

In this respect, RCW 48.102.100 is very different from RCW 48.18.290, which prohibits the cancellation of an insurance policy absent the advance notice mandated by the statute.  _See_ _Olivine Corp. v. United Capitol Ins. Co._, 147 Wn.2d 148, 162, 52 P.3d 494 (2002) (interpreting RCW 48.18.290 (1998) ("Cancellation by the insurer . . . _may be effected as to any interest only upon compliance with the following:_ (a) Written notice of such cancellation . . . ." (emphasis in original))).  The dissimilar language of the statutes is consistent with the distinction between cancellation of a

---

[2] John Hancock cannot avoid the conclusion that it violated RCW 48.102.100(1)(c) by contending that it was justified in waiting to issue alternative transaction notices until after the regulation outlining the text of such notices was amended.  The statute was in effect when John Hancock sent the Trust the lapse notices at issue, and the form set forth in the regulation did not in fact change much between July 2009 and March 2010.  In other words, John Hancock's reason for delaying its compliance with the statute does not go to whether it violated the statute, but rather to whether such violation gives rise to a CPA and/or bad faith claim, which constitutes a factual issue for trial.

policy, a unilateral act by the insurer, *see* *Safeco Ins. Co. v. Irish*, 37 Wn. App. 554, 558, 681 P.2d 1294 (1984), and lapse of a policy, an automatic result of an insured's failure to timely pay a premium.

### 3. <u>Statutory Notice Is Not Term of Policy</u>

Plaintiffs' further use of RCW 48.102.100(1)(c) as a basis for claiming breach of contract is equally unavailing. Although regulatory statutes are generally incorporated by law into insurance policies, they cannot be treated as terms of a policy when they are enacted after the policy is issued and they are not expressly retroactive. *See* *Vadheim v. Cont'l Ins. Co.*, 107 Wn.2d 836, 840, 734 P.2d 17 (1987); *Britton v. Safeco Ins. Co. of Am.*, 104 Wn.2d 518, 528, 707 P.2d 125 (1985); *Tremper v. Nw. Mut. Life Ins. Co.*, 11 Wn.2d 461, 464, 119 P.2d 707 (1941); *In re Heilbron's Estate*, 14 Wn. 536, 543, 45 P. 153 (1896); *see also* U.S. Const. art. I, § 10; Wash. Const. art. I, § 23 ("[n]o . . . law impairing the obligations of contracts shall ever be passed"). RCW 48.102.100(1)(c) became effective on July 26, 2009, over three years after the Policy was issued, and the language of the statute contains no indication that the Legislature intended it to be applied retroactively. The Court HOLDS, as a matter of law, that RCW 48.102.100 is not a term of the Policy.

/ / /

/ / /

/ / /

/ / /

**D.**     **Violation of WSSA and Fraud**

With regard to plaintiffs' securities claim, John Hancock moved for summary judgment on three grounds:  (i) failure to adequately plead the WSSA claim; (ii) failure to bring the claim within the 3-year limitations period; and (iii) failure to present a viable claim.  As to plaintiffs' fraud claim, John Hancock made similar arguments regarding plaintiffs' deficient pleading and failure to establish a prima facie case.  The Court is persuaded that plaintiffs' WSSA and fraud claims are both lacking in merit and that neither claim is sufficiently pleaded.  As a result, the Court need not and does not address whether the statute of limitations bars plaintiffs' WSSA claim.

The WSSA imposes civil liability on any person who offers or sells a security in violation of certain statutory provisions.  *See* RCW 21.20.430(1).  The only provision that plaintiffs allege John Hancock violated is RCW 21.20.010(2), which prohibits a person from making "any untrue statement of a material fact" or from omitting "a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  Plaintiffs' WSSA claim is not premised on any misrepresentation, but rather on John Hancock's failure to reveal certain information before the Trust purchased the Policy.  Plaintiffs' fraud claim is likewise based on an alleged breach of an affirmative duty to disclose a material fact.  *See Crisman v. Crisman*, 85 Wn. App. 15, 21, 931 P.2d 163 (1997).

/ / /

/ / /

ORDER - 14

The information plaintiffs contend should have been included in the Prospectus is as follows:

- death benefits on variable life insurance policies are seldom paid;
- part of the value of a life insurance policy is the ability to sell it on a secondary market;
- the secondary market for life insurance policies is thriving;
- variable life insurance policies are hard to sell because they are securities;
- jumbo life insurance policies are hard to sell; and
- as a jumbo, variable life insurance policy, the policy at issue would be extremely difficult to sell.

*See* Plaintiffs' Motion at 23:15-22 (docket no. 43).

Because the primary purpose of the WSSA is to protect investors, it is construed liberally.  *Guarino v. Interactive Objects, Inc.*, 122 Wn. App. 95, 109, 86 P.3d 1175 (2004).  To establish a claim under the WSSA, an investor must prove (i) the seller made material misrepresentations or omissions about the security and (ii) the investor relied on those misrepresentations or omissions.  *Stewart v. Estate of Steiner*, 122 Wn. App. 258, 264, 93 P.3d 919 (2004).  In an omission case, like the one before the Court, a rebuttable presumption of reliance exists.  *Guarino*, 122 Wn. App. at 119.  A defendant may rebut the presumption of reliance by showing that "the plaintiff's decision would have been unaffected even if the omitted fact had been disclosed."  *Id.*

The presumption of reliance does not, however, arise unless the plaintiff proves that the omission at issue is material.  *Id.*  For an undisclosed fact to be material, the plaintiff must establish a substantial likelihood that disclosure "of the omitted fact

would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." _Id._ at 114.  When contingent or speculative events are involved, materiality depends upon on a balancing of the indicated probability of the event occurring and the anticipated magnitude of the event. _Id._

Statements about future performance are not representations of existing fact and generally will not support a claim of fraud or misrepresentation.  _Seattle Pac. Indus., Inc. v. Melmarc Prods., Inc._, 2007 WL 397450 at *3 (W.D. Wash. Jan. 31, 2007). A representation that something will be done in the future cannot be either true or false at the time it is made.  _Id._  Moreover, failure to make forecasts about future events is not actionable.  _In re Verifone Secs. Litig._, 11 F.3d 865, 869 (9th Cir. 1993); _Scognamillo v. Credit Suisse First Boston, LLC_, 587 F. Supp. 2d 1149, 1160 (N.D. Cal. 2008).  Likewise, a claim for fraudulent misrepresentation or omission cannot be based on matters of opinion.  _See_ _Lincoln v. Keene_, 51 Wn.2d 171, 174-75, 316 P.2d 899 (1957); _O'Neil v. Washelli Cemetery Ass'n_, 138 Wn. 566, 568-69, 244 P. 990 (1926); _Westby v. Gorsuch_, 112 Wn. App. 558, 570-71, 50 P.3d 284 (2002); _Holly Homes, Inc. v. Urban Housing Group Ltd. P'ship V_, 1997 WL 3199 at *3 (Wash. Ct. App. June 27, 1997).

The Court HOLDS, as a matter of law, that the information plaintiffs allege was unlawfully omitted from the Prospectus falls within the realm of forecasts and opinions and does not involve any material facts.  In essence, plaintiffs seek to hold

John Hancock liable for not providing a written prediction that the Policy would be difficult to sell.  Ease or difficulty is a matter of opinion, with some viewing as easy what others perceive as difficult, and any statement about whether market conditions at some unknown future date might favor or deter a sale would be nothing more than speculation.  Thus, plaintiffs cannot establish a prima facie case for either their WSSA or their fraud claim.

The Court further CONCLUDES that plaintiffs have failed, as a matter of law, to link the alleged omissions to any statement actually made by John Hancock concerning the marketability of either the policy at issue or any similar or different types of policies.  Plaintiffs point to nothing actually in the Prospectus that is misleading as a result of the absence of the information plaintiffs believe should have been included.  This lack of proof constitutes an independent basis for dismissing plaintiffs' WSSA claim.  _See_ RCW 21.20.010(2) (imposing liability for omitting only "a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading").

Not only are plaintiffs' WSSA and fraud claims lacking in merit, they were not sufficiently pleaded.  In the original complaint, the Trust included the following allegation:

> In connection with the issuance of the Policy, Defendant made materially misleading statements of fact, and/or failed to make disclosures regarding the Policy necessary to make those statements of fact made by Defendant, not materially misleading.

Complaint at ¶ 7 (docket no. 1).  The original complaint made no reference to the Prospectus dated May 1, 2006, and it did not identify with specificity any material facts that John Hancock either misrepresented or omitted.

In October 2010, the Trust filed a Second Amended Complaint.[3]  This now operative pleading did not improve matters.  As acknowledged by plaintiffs' counsel during oral argument, Paragraph 7 of the original complaint was deleted, and the operative pleading contains no allegation (even in a formulaic or conclusory form) of a misleading statement or omission.  The Ninth Circuit has repeatedly held that an "amended complaint supersedes the original," which is treated thereafter as "non-existent."  _E.g._, _Forsyth v. Humana, Inc._, 114 F.3d 1467, 1474 (9th Cir. 1997).  The Court CONCLUDES that, with respect to the WSSA and fraud claims, the Second Amended Complaint does not meet the pleading standards articulated in _Bell Atlantic Corp. v. Twombly_, 550 U.S. 544 (2007), and its progeny.  As explained in _Twombly_, a complaint must offer "more than labels and conclusions" and must contain more than a "formulaic recitation of the elements of a cause of action."  _Id._ at 555.

The Ninth Circuit has made clear that "summary judgment is not a procedural second chance to flesh out inadequate pleadings."  _Wasco Prods., Inc. v. Southwall Techns., Inc._, 435 F.3d 989, 992 (9th Cir. 2006) (citing _Fleming v. Lind-Waldock &_

---

[3] The Second Amended Complaint alleged violation of federal securities law, but plaintiffs' summary judgment briefing discussed only state securities law.  Thus, whether plaintiffs are asserting a federal claim remains unclear.  Any federal claim, however, would be analyzed in the same manner as plaintiffs' WSSA claim and would similarly fail.  _See_ _Shawmut Bank, N.A. v. Kress Assocs._, 33 F.3d 1477, 1484 (9th Cir. 1994) (claim under § 10(b) of the Securities and Exchange Act likewise requires a misstatement or an omission of material fact).

_Co._, 922 F.2d 20, 24 (1st Cir. 1990)).  To the extent plaintiffs contend that they could amend or supplement their complaint by presenting factual allegations in their summary judgment briefing, the weight of authority contradicts them.  _See_, _e.g._, _Shanahan v. City of Chicago_, 82 F.3d 776, 781 (7th Cir. 1996).  In addition, to the extent plaintiffs now seek to amend their complaint, the Court denies such request as futile.  _See Gordon v. City of Oakland_, 627 F.3d 1092, 1094 (9th Cir. 2010) ("leave may be denied if amendment of the complaint would be futile").  Given the failure to identify actionable omissions of material fact and the missing link between the alleged omissions and any actual representations, the Court granted John Hancock's motion for summary judgment as to plaintiffs' WSSA and fraud claims.

## E.   **CPA and Bad Faith Claims**

With respect to plaintiffs' CPA[4] and bad faith[5] claims, John Hancock contends that summary judgment is warranted because plaintiffs cannot establish either causation or damages.  The Court is satisfied that plaintiffs have presented sufficient evidence to raise triable issues as to these elements of their CPA and bad faith claims. Plaintiffs' CPA claim is premised solely on John Hancock's failure to provide notices

---

[4] To establish a violation of the CPA, a private plaintiff must prove (i) the defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred within a trade or business; (iii) such act or practice affected the public interest; (iv) the plaintiff suffered an injury to business or property; and (v) a causal relationship exists between the defendant's act or practice and the plaintiff's injury. _Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co._, 105 Wn.2d 778, 785-93, 719 P.2d 531 (1986).

[5] Bad faith claims sound in tort. _Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc._, 161 Wn.2d 903, 915, 169 P.3d 1 (2007).  They are analyzed under the same principles as any other tort, requiring a plaintiff to show existence of a duty, breach of that duty, and damages proximately caused by such breach.  _Id._ at 916.  To establish bad faith, a plaintiff must prove that the breach was "unreasonable, frivolous, or unfounded."  _Id._

of alternative transactions in violation of RCW 48.102.100(1)(c).  John Hancock argues that plaintiffs cannot link the lack of notice to any injury, reasoning that plaintiffs already knew they could, and had actually taken steps to, sell the Policy.  The required notice of alternative transactions, however, would have advised plaintiffs of more than just the possibility of "a life settlement," *i.e.*, a sale to a third party, *see* WAC 284-97-910 (listing eight alternatives to lapse), and the Court cannot conclude as a matter of law that such notice would not have made a difference in how plaintiffs proceeded prior to the lapse of the Policy.  *See* *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 83, 170 P.3d 10 (2007) ("Proximate cause is a factual question to be decided by the trier of fact.").

   The Court notes, however, that plaintiffs' damages for their CPA claim appear to be limited to the value of the options actually available to them at the time the notice of alternative transactions was not provided, *i.e.*, in December 2009 or January 2010, or at the latest on February 20, 2010, when the premium was due.  The only such damages appear to be the cash surrender value of the Policy.  *See* WAC 284-97-910.  The other alternatives of which plaintiffs were entitled to notice are either inapplicable or would have required third-party involvement, which the Court would tend to view as a matter of speculation.[6]  The parties are encouraged to further address this issue in their trial briefs.

---

[6] Although rescission might be an available remedy for a CPA claim predicated on an unfair or deceptive trade practice that induced the purchase, *see* *Allen v. Am. Land Research*, 95 Wn.2d 841, 852, 631 P.2d 930 (1981), plaintiffs make no such claim.  Given the nature of their CPA claim, plaintiffs would likewise not be entitled to injunctive relief, the parties having agreed that John

In contrast to their CPA claim, plaintiffs' bad faith claim is based only in part on John Hancock's violation of RCW 48.102.100(1)(c).  Their bad faith claim also rests on other actions by John Hancock, namely engaging in allegedly unreasonable delay in determining that Mr. Trudeau's check was NSF, declaring the Policy lapsed despite multiple communications to the contrary,[7] and failing to provide the Trust a reasonable opportunity to cure.  See Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 386, 715 P.2d 1133 (1986) (indicating that an insurer's "duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders:  an insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests" (emphasis in original)).  The Court cannot say as a matter of law that the alleged bad faith has no causal link to any injury suffered by plaintiffs, and thus, John Hancock is not entitled to summary judgment as to the bad faith claim.  See Am. States Ins. Co. v. Symes of Silverdale, Inc., 150 Wn.2d 462, 470, 78 P.3d 1266 (2003) ("Whether an insurer acted in bad faith is a question of fact.");

---

Hancock has been in compliance with RCW 48.102.100(1)(c) since April 2010.  See Hockley v. Hargitt, 82 Wn.2d 337, 351, 510 P.2d 1123 (1973) (approving of an injunction to enjoin further violations of the CPA).

[7] Plaintiffs attempt to invoke the doctrine of equitable estoppel to prevent John Hancock from asserting that the Policy lapsed as a result of the failure to pay the premium due in February 2010.  Under Washington law, however, plaintiffs cannot use the doctrine of equitable estoppel, independent of their bad faith claim, as a means of preserving or reviving the lapsed Policy.  See Rizzuti v. Basin Travel Serv. of Othello, Inc., 125 Wn. App. 602, 614, 105 P.3d 1012 (2005) ("Estoppel may not be applied to extend the coverage of an insurance policy.  The rationale for this rule 'is that an insurer should not be required to pay for a loss for which it received no premium.'  This rule may be inapplicable if the insurer acts in bad faith. . . .  [N]o estoppel arises if the injured party had an equal opportunity to determine the facts." (citations omitted)); Shows v. Pemberton, 73 Wn. App. 107, 111, 868 P.2d 164 (1994).

*Griffin v. Allstate Ins. Co.*, 108 Wn. App. 133, 148, 29 P.3d 777 (2001) (whether

damages were a "direct result" of bad faith is a question of fact).

In their summary judgment briefing, the parties did not directly address the

remedies available for a bad faith claim.  Plaintiffs, however, appear to seek remedies

beyond actual or consequential damages, namely a refund of premiums or coverage by

estoppel.  Under Washington law, the availability of these latter remedies seems to

turn on whether the action involves a third-party or a first-party claim.  With respect to

a third-party claim, arising for example when an insurer refuses in bad faith to defend

or engages in bad faith handling of a claim under a reservation of rights, coverage by

estoppel is a possible remedy.  *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 564, 951

P.2d 1124 (1998); *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 392, 823 P.2d 499

(1992).

In contrast, in a first-party action, which might involve an insured who has

suffered damage caused by inclement weather or other forces of nature, the criminal

conduct of others, or the insured's own negligence, Washington law is clear that

coverage by estoppel may not be imposed.  *See* *Coventry Assocs. v. Am. States Ins.*

*Co.*, 136 Wn.2d 269, 284, 961 P.2d 933 (1998) ("We hold coverage by estoppel in the

first party context is not the appropriate remedy because, unlike third party reservation

of rights cases, the loss in the first party situation has been incurred before the

insurance company is aware a claim exists.").  Moreover, in a bad faith first-party

action, absent proof of coverage, the insured is not entitled to policy benefits, *id.*, and

the insured may not recover the premiums previously paid or a portion thereof.  *Id.* at

285 (rejecting the insured's contention that it should receive the portion of the

premium it paid to the insurer for claims administration on the theory that the insurer

should not be able to collect a premium, act in bad faith in using a portion of that

premium, and then retain the entire premium).

As indicated in *Coventry*, however, a plaintiff prevailing on a first-party claim

that an insurer acted in bad faith in evaluating coverage may recover consequential

damages even when the denial of coverage is ultimately determined to be correct.  *Id.*

at 284-85.  Such consequential damages may include the expense of hiring an expert to

investigate whether coverage was due.  *Id.* at 285.  The parties are DIRECTED to

address in their trial briefs whether plaintiffs' remedies for their bad faith claim are

limited to any actual and/or consequential damages caused by John Hancock's alleged

bad faith in failing to provide notice of alternative transactions and/or in handling the

check tendered for payment of the premium due in February 2010 and the later events

relating thereto.  Plaintiffs are further DIRECTED to provide, in their trial brief, an

offer of proof concerning any such actual and/or consequential damages.

## Conclusion

For the foregoing reasons, the Court denied in part and granted in part

defendant's motion for summary judgment, docket no. 37, and denied in part and

granted in part plaintiffs' cross-motion for partial summary judgment, docket no. 43.

Plaintiffs' CPA and bad faith claims shall remain in the case for trial, consistent with this Order.

IT IS SO ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.

DATED this 27th day of October, 2011.

Thomas S. Zilly
United States District Judge

ORDER - 24